## 19083.   CLARK *v.* WOOD.

Decided February 21, 1929.

*A. W. White,* for plaintiff in error.
*Frank T. Grizzard, H. F. Sharp,* contra.

Bell, J.   Mrs. Wood made a contract with Mrs. Clark for the purchase of two cows at the price of $100, paying $5 at the time and agreeing to pay the remaining $95 in a few days, when the cows were to be delivered.   In about a week Mrs. Wood went for the cows and Mrs. Clark would not deliver them.   Mrs. Wood tendered the balance due and demanded performance.   The tender and the demand were both refused.   Mrs. Wood then brought a suit in trover against Mrs. Clark in the municipal court of Atlanta to recover the property, and two days after the filing of the suit she paid into court the sum of $95 as a cash tender to the defendant.   The facts appearing as above stated, the plaintiff, on the trial, was nonsuited.   She moved for a new trial, which the court refused, and, on her appeal to the appellate division, the judgment of the trial court was reversed; whereupon the defendant carried the case by certiorari to the superior court, and, the certiorari being overruled, the defendant excepted.

Besides the receipt from Mrs. Clark for the initial payment of $5 and a receipt from the clerk of the municipal court showing deposit in court of the remaining $95 as continuing tender, the only evidence adduced was the testimony of the plaintiff, which, so far as material, was as follows: "I purchased some cows from Mrs. I. C. Clark, the defendant, on February 28. I bought two cows from her. One was a little black and white spotted Holstein cow, and the other was supposed to be a Jersey cow. I paid Mrs. Clark $100 for these cows, or, rather, that is what I was to pay her. I gave her $5 and took a receipt for it. The paper which you hand me is the receipt I got. I was to pay the balance when I went for the cows Monday morning. I bought the cows on Monday, and was to go for them the third day, if nothing happened. It was snowing and sleeting, so I called Mrs. Clark and told her I couldn't get over there, and she said it would be all right. I had a cow which had freshened in the meantime, and I had to stay up two nights with her. I called Mrs. Clark about the cows on Friday and she said, 'I kept the cows up one day and you didn't come for them.' I told her that the weather had been bad and that I had had a sick cow. I told her that my husband didn't have but two hours off, but that if he found that he had time he would be up there for the cows on Saturday, but that if he didn't I would come for them Monday. We went up there Monday morning and carried the truck. That was the following Monday after I had paid her the $5. I told Mrs. Clark that I had come for the cows and she said, 'I expect those cows have beeen sold,' I thought she was joking. I said, 'Here's your money.' She said, 'Those cows have been sold.' I said, 'Those are my cows and I want them. I have been to a lot of trouble.' She said, 'Here's your money.' I said, 'I don't want the money. That is not right.' I went back to the truck and told my husband what she had said. I told Mrs. Clark that if she was going to treat me that way, she ought to pay me for my trouble. I told her I would let the courts settle it. It was snowing and sleeting and raining all at the same time. When I phoned Mrs. Clark she said it was all right. I didn't ask her then where the cows were. She told me on the following day that she had kept them up, but that they were then out in the pasture. I went for the cows the following Monday morning. I saw the cows and valued them at $100 apiece. That is what they would have brought

me. I am acquainted with the value of cattle, as I handle cattle. The calf of one of those cows was ten days old and Mrs. Clark told me she was giving three gallons of milk, and the other was to freshen in two weeks. . . It costs a good deal to feed cows. Mrs. Clark said she had fed these cows several days, and I offered to pay her. I told her I would pay her for the feed. She says, 'All I want to do is to give your money back.' I said, 'If it has cost you anything, I will pay it.' . . I bought both of these cows for $100, and could have sold them for $100 apiece. I think I bought them cheap; if I hadn't, I would not have bought them. I decided I would take the cows and Mrs. Clark came out to the car and wrote me a receipt after I had got in the car. She priced the cows to me while I was in the house. I told her I would take the cows, and she wrote me a receipt. If I had been going off without taking these cows, I would have [gone]. I did not tell Mrs. Clark that I would not give her over $40 apiece for the cows; I gave her what she asked for them. The other cow not being present, I told her I was taking some risk, but as we were just $10 apart, I told her I would give her price, and I did. . . I was to pay her for the cows when I went back after them. The receipt says that I was to pay her on March 1—whatever it says. If I had known that she was not going to let me have the cows, I would have hired somebody to go and get them. I carried Mrs. Clark a $100 bill and she wouldn't have it."

Under the evidence adduced, the contract upon which the plaintiff relied was a mere executory agreement to sell, not passing the title; and, in such a case, although a part of the purchase-money has been paid down, the sale can not be rendered executed simply by a tender by the vendee of the remainder of the purchase-money, where the vendor, repudiating the contract, declines the tender and refuses to deliver the property. Civil Code (1910), § 4125; *Dilman* v. *Patterson Produce Co.,* 2 *Ga. App.* 213 (2, 3) (58 S. E. 365); *Luke* v. *Batts,* 11 *Ga. App.* 783 (76 S. E. 165); *Bowen* v. *DeLoach,* 13 *Ga. App.* 458 (79 S. E. 371); *Dudley* v. *Isler,* 21 *Ga. App.* 615 (3, 4) (94 S. E. 827); *Rowell* v. *Fincher,* 33 *Ga. App.* 506 (126 S. E. 886); *Fleming* v. *State,* 106 *Ga.* 359 (32 S. E. 338); *Rowe* v. *Spencer,* 140 *Ga.* 540 (79 S. E. 144, 47 L. R. A. (N. S.) 561).

Under the facts stated, trover would not lie, but the plaintiff's

remedy would be an action for damages for the breach of the contract. *Maddox* v. *Wagner,* 111 *Ga.* 146 (36 S. E. 609) ; *Oklahoma Vinegar Co.* v. *Carter,* 116 *Ga.* 140 (2) (42 S. E. 378, 59 L. R. A. 122, 94 Am. St. R. 112).

There was in this case no evidence of an actual delivery, or of any intention by the parties to dispense therewith, and nothing to show that the title to the property ever passed to the vendee, so as to authorize its recovery from the vendor in an action of trover. This conclusion is not in conflict with anything held either in *Biggers* v. *Pace,* 5 *Ga.* 171 (5), or in *Phillips* v. *Williams,* 39 *Ga.* 597 (3), when the decisions in those cases are interpreted properly in the light of their special facts. In the *Biggers* case it was held that, even though the title may have passed from the seller to the buyer, this fact would not prevent an action by the buyer to recover the difference between the contract price and the market value, where the seller had retained possession of the goods and refused to deliver them on demand. The question decided was whether the buyer could employ the latter remedy under the facts of that case, the Supreme Court saying: "We think it clear that the corn never was delivered. It was in defendant's crib and on his premises. He never parted with the dominion over it. . . But admit that the title had passed to Biggers, the buyer, if Pace, the seller, would not surrender the corn, Biggers might either reclaim the corn by an action of *trover* [citations] or he could, as he has done, bring a special action on the case for damages, and recover the market value of the corn at the time and place when and where it was to have been delivered."

In the *Phillips* case the plaintiff brought a suit for damages, which he amended by adding a count in trover. The defendant pleaded that it was agreed that he should keep the cotton as security until the note for the remainder of the purchase-money was paid; that after the plaintiff refused to pay the note and after due notice, he, the defendant, sold the cotton; that it brought less than it was due on the note, and the note was pleaded as a set-off. "On the trial there was no dispute as to the fact of the bargain or of its main terms," except as to the time and medium of payment. It thus appears that the parties *were agreed* that the title passed, and what the Supreme Court really held, on the question of title, was that if the plaintiff made a proper tender of the purchase-money

344

in the medium required by the contract, the title became thereby relieved of the incumbrance to the extent that the defendant would not have been authorized to sell the property to satisfy the debt, as he did. In view of the issues there made, the decision in that case can not be construed as holding that the vendee in an executory contract of sale can acquire title by tendering the purchase-money, where the vendor refuses to accept it and will not deliver the property.

The municipal court judge properly awarded a nonsuit and correctly refused a new trial. Since the appellate division erred as a matter of law in not denying the plaintiff's appeal, the superior court should have sustained the defendant's certiorari.

Since the decisions in *Shippey* v. *Owens*, 17 *Ga. App.* 127 (2) (86 S. E. 407), and *Murphy* v. *Sulzberger*, 17 *Ga. App.* 686 (87 S. E. 808), were rendered, the act creating the municipal court of Atlanta was amended so as to confer upon the trial judge in that court the same power and authority to grant a nonsuit as may be exercised by the judges of the superior courts of this State. Ga. L. 1916, p. 199, sec. 4.

*Judgment reversed. Jenkins, P. J., concurs. Stephens, J., dissents.*

STEPHENS, J., dissenting. I am of the opinion that the evidence authorized the inference that the contract amounted to an executed sale, so as to pass the title to the property. Therefore I think it was error to grant a nonsuit.